# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

Nos. 32 & 33
Lukasz Gottwald, &c., et al.,
   Respondents,
  v.
Kesha Rose Sebert, &c.,
   Appellant,
et al.,
   Defendants.

Case No. 32:

Anton Metlitsky, for appellant.
Christine Lepera, for respondents.
Legal Momentum et al.; Samuel D. Isaly; Advance Publications, Inc. et al.; and Maria Kim Grand, amici curiae.

Case No. 33:
Anton Metlitsky, for appellant.
David A. Steinberg, for respondents.
Samuel D. Isaly; National Women's Law Center et al.; and The Reporters Committee for Freedom of the Press et al., amici curiae.

GARCIA, J.:

Plaintiff in this defamation suit, Lukasz Gottwald ("Gottwald"), is a music producer known as "Dr. Luke." Defendant Kesha Rose Sebert ("Sebert") is a singer and songwriter known as "Kesha." Sebert signed a recording contract with one of Gottwald's companies in 2005 and the arrangement produced several successful albums. However, in 2014, Sebert sought to void her contractual arrangement with Gottwald by filing an action in California, alleging that Gottwald raped her shortly after she signed the original recording deal. In response, Gottwald brought this action in New York alleging that statements made

by Sebert and her agents with respect to the alleged sexual assault were defamatory. We hold that Gottwald is a limited public figure who must prove by clear and convincing evidence that Sebert acted with actual malice; that five of the allegedly defamatory statements are privileged as a matter of law while the issue of privilege as to the remaining 20 statements must be resolved by a jury; and that certain provisions of the 2020 amendments to Civil Rights Law §§ 76-a and 70-a apply to this action.

I.

Gottwald, in addition to being a music producer, also owns several companies, including plaintiffs Kasz Money, Inc. ("KMI") and Prescription Songs, LLC. In 2005, Gottwald signed Sebert, an aspiring singer and songwriter, to a record deal through KMI. Sebert alleges that a short time later Gottwald raped her—an allegation he has denied. Through her representatives, Sebert subsequently attempted to gain her release from the KMI agreement based on the alleged sexual assault. Those efforts were unsuccessful. Instead, in 2008, the parties amended the KMI agreement and entered into separate publishing and recording agreements. In 2010, Gottwald and KMI released two commercially successful albums with Sebert, and in 2012, Gottwald and Sebert released a third album through another of Gottwald's record labels.

By 2012, however, Sebert sought to renegotiate the terms of her agreements with Gottwald but attempts to settle the dispute were once more unsuccessful. Sebert then commenced an action against Gottwald and his various companies in California, alleging that Gottwald had raped her in 2005 and seeking damages as well as an injunction voiding

her contracts with plaintiffs.  Gottwald filed this action in Supreme Court, New York County, that same day.  The operative complaint pleads two counts of defamation against Sebert.  The first asserts that she acted with malice in making false statements regarding the alleged rape.  The second count is based on a statement made by Sebert alleging Gottwald raped another female recording artist.[1]

The California court granted Gottwald's motion for a stay of that action, while Sebert filed counterclaims here based on the same allegations contained in her California complaint.  She then moved in Supreme Court for a preliminary injunction asking the court to enjoin Gottwald and his companies from interfering with her attempts to work with others and to prevent them from enforcing any contractual exclusivity and ownership provisions.  The court denied the injunction.  In 2016, Supreme Court granted Gottwald's motion to dismiss Sebert's counterclaims as, *inter alia*, time-barred and outside Supreme Court's subject matter jurisdiction (2016 NY Slip Op 32815 [U] [Sup Ct, NY County 2016]).  Sebert appealed the denial of the injunction and dismissal of her counterclaims but later withdrew both appeals and voluntarily dismissed her California action.[2]

After completing discovery, the parties cross-moved for summary judgment.  As relevant here, Sebert argued that Gottwald is a public figure and can recover for defamation only upon proof that the alleged defamatory statements were made with actual malice, and

---

[1] That artist denied any sexual assault by Gottwald and the Appellate Division determined that the statement was defamatory per se (*see* 193 AD3d 573, 581 [1st Dept 2021]).

[2] None of Sebert's original counterclaims in this action survive.

that 25 of those statements cannot serve as the basis for liability in any event because they are privileged. Supreme Court granted partial summary judgment in favor of Gottwald and denied Sebert's motion (2020 NY Slip Op 30347 [U], at *5 [Sup Ct, NY County 2020]). Sebert appealed.

In 2020, while that appeal was pending, the Legislature amended a 1992 statute designed to protect certain individuals who face targeted litigation for their participation in public affairs, i.e., Strategic Lawsuits Against Public Participation ("SLAPP" suits). The 1992 law—New York's anti-SLAPP statute (L 1992, ch 767)—is codified in Civil Rights Law § 76-a and § 70-a. Sebert moved in Supreme Court for a ruling that the 2020 amendments to the anti-SLAPP statute apply to this action and for leave to assert a counterclaim for attorney's fees, damages for emotional distress, and punitive damages, as permitted by the amended statute. That court agreed, holding that the amendments applied retroactively to pending claims and granting Sebert leave to file a counterclaim. Gottwald appealed that decision.

The Appellate Division, in two separate opinions, reversed on the application of the anti-SLAPP statute, holding that the amendments were not retroactive and so did not apply to this litigation, and affirmed Supreme Court's holding that Gottwald was not a public figure and that issues of fact precluded the grant of summary judgment on certain defamatory statements (203 AD3d 488 [1st Dept 2022]; 193 AD3d 573 [1st Dept 2021]). The respective panels granted Sebert leave to appeal, certifying in each case the question of whether the orders were properly made. We answer each question in the negative.

II.

We first consider whether Gottwald is a public figure such that he must prove the allegedly defamatory statements were made with "actual malice" (*see Huggins v Moore,* 94 NY2d 296, 301 [1999]).  If subject to that standard, Gottwald would be required to prove by clear and convincing evidence that each statement was made "with either knowledge that it was false or reckless disregard for the truth" (*id.*; *see also New York Times Co. v Sullivan*, 376 US 254, 279-280 [1964]).  This actual malice standard need not apply to private figures (*see Wolston v Reader's Digest Ass'n, Inc.*, 443 US 157, 164 [1979]); rather, "the States may define for themselves the appropriate standard of liability" for those individuals (*Gertz v Robert Welch, Inc.*, 418 US 323, 347 [1974]).  In New York, the accepted standard for private figures is negligence (*see Krauss v Globe Intl.,* 251 AD2d 191, 194 [1st Dept 1998]; *see also Kesner v Buhl*, 590 F Supp 3d 680, 692 [SD NY 2022]).

"The category of public figures is of necessity quite broad" (*James v Gannett Co.,* 40 NY2d 415, 422 [1976] [internal quotation marks and citation omitted]).  At the same time, public figure status "is a matter of degree" (*id.* at 423).  Certain individuals may be considered public figures for all purposes while others "may invite publicity only with respect to a narrow area of interest" and may fairly be considered public figures only where the alleged defamation relates to the publicity they sought (*id.*).  One becomes such a limited-purpose public figure through some "purposeful activity," by which the individual has "thrust" themselves "into the public spotlight and sought a continuing public interest in [their] activities" (*id.* at 423; *see also Maule v NYM Corp.*, 54 NY2d 880 [1981]).  In that

case, an otherwise private individual may properly be considered "a public personality" (*id.*; *see Kipper v NYP Holdings Co., Inc.*, 12 NY3d 348, 353 n 3 [2009]). We agree with the dissent below that Gottwald meets this standard and is a limited-purpose public figure (193 AD3d at 587 [Scarpulla, J., dissenting] [Gottwald "purposefully and continuously publicized and promoted his business relationships with young female artists, like (Sebert), to continue to attract publicity for himself and new talent for his label"]).

By 2014, when Gottwald initiated this defamation action, he was, by his own account, a celebrity—an acclaimed music producer who had achieved enormous success in a high-profile career. As self-described in the complaint, he "has written the most Number One songs of any songwriter ever" and "was named by Billboard as one of the top ten producers of the decade in 2009." Gottwald's engagement with the media was "obviously designed to project his name and personality" before a wide audience to establish his reputation in this field (*see Maule,* 54 NY2d at 882). He purposefully sought media attention for himself, his businesses, and for the artists he represented, including Sebert, to advance those business interests (*see James*, 40 NY2d at 423). He had been featured in various publications, as well as on radio and television, highlighting the nature of his relationships with those artists and his development of their talent and careers. Sebert alleged that, shortly after establishing a professional relationship as her producer, Gottwald sexually assaulted her. Therefore, Gottwald is appropriately considered a limited-purpose public figure, and as a result he must prove that Sebert's allegedly defamatory statements were made with actual malice.

III.

Sebert identifies 25 allegedly defamatory statements that she contends cannot serve as the basis for liability because they are protected by one or more of three privileges:  the litigation privilege, the pre-litigation privilege, and the statutory fair report privilege under Civil Rights Law § 74.  Supreme Court denied summary judgment on the privileged statements, reasoning that "sharply disputed questions of fact going to the heart of the case about whether Sebert's California complaint was brought in good faith…or whether it was a 'sham' intended to defame and pressure plaintiffs" require that the privilege issues be decided by a jury (2020 NY Slip Op at *9-10).  The Appellate Division agreed with Supreme Court that issues of fact regarding whether the litigation was brought in good faith precluded summary judgment on the application of any privilege.  The court explained that the jury could conclude that Sebert "commenced that action … to pressure Gottwald into renegotiating her contracts or to release her from her contracts" and that there was record support for Gottwald's allegations that Sebert's action was a sham (193 AD3d at 580).  We agree that questions of fact exist as to the application of the pre-litigation and fair report privileges—those issues must go to a jury—but disagree as to application of the absolute litigation privilege.

In general, "[a] privileged communication is one which, but for the occasion on which it is uttered, would be defamatory and actionable" (*Park Knoll Assoc. v Schmidt*, 59 NY2d 205, 208 [1983]).  "The privilege may be either absolute or conditional depending on the occasion and the position or status of the speaker" (*id.* at 208-209).  This Court has

long held that "absolute immunity from liability for defamation exists for oral and written statements made by attorneys in connection with a proceeding before a court 'when such words and writings are material and pertinent to the questions involved' " (*Front, Inc. v Khalil*, 24 NY3d 713, 718 [2015], quoting *Youmans v Smith*, 153 NY 214, 219 [1897]). The litigation privilege, being absolute, "confers immunity from liability regardless of motive" (*Park Knoll Assoc.*, 59 NY2d at 209).

In its analysis of the applicability of the absolute privilege, the Appellate Division relied upon a line of cases holding that this privilege may be "lost if abused" in certain circumstances (*Halperin v Salvan,* 117 AD2d 544, 548 [1st Dept 1986]), for example, if the underlying action was brought with malice (*see Lacher v Engel*, 33 AD3d 10, 14 [1st Dept 2006]). Accordingly, that Court held that the privilege "will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendant" (193 AD3d at 580, quoting *Flomenhaft v Finkelstein*, 127 AD3d 634, 638 [1st Dept 2015]; *Lacher*, 33 AD3d at 10). This was error.

A "sham exception" is inconsistent with the absolute privilege recognized by this Court for statements made in connection with judicial proceedings. It is well-established that "[i]n questions falling within the absolute privilege the question of malice has no place" (*Moore v Manufacturers' Natl. Bank of Troy*, 78 Sickels 420, 426 [1890]). The five statements Sebert claims are covered by the absolute litigation privilege relate to the California complaint, the counterclaims in the New York action, and an affidavit in support of her motion for a preliminary injunction. Each of these statements was made during the

course of a judicial proceeding and each is "material and pertinent to the questions involved" in the California and New York actions (*Front*, 24 NY3d at 718, citing *Youmans*, 153 NY at 219). Because these five statements fall squarely within the purview of the absolute litigation privilege, they " 'cannot serve as the basis for the imposition of liability in a defamation action' " (*Rosenberg v MetLife, Inc.*, 8 NY3d 359, 365 [2007], quoting *Toker v Pollak,* 44 NY2d 211, 218 [1978]).

Sebert asserts that two of the remaining statements are protected by a separate pre-litigation privilege: a draft version of the California complaint sent by Sebert's representatives to the general counsel of Sony Music Entertainment (which owned one of Gottwald's companies that had a contract with Kesha) during settlement negotiations; and an embargoed copy of the California complaint sent by Sebert's representatives to a tabloid news organization shortly before it was filed.

Generally, statements made in anticipation of good faith litigation are privileged, given that "[c]ommunication during this pre-litigation phase should be encouraged and not chilled by the possibility of being the basis for a defamation suit" (*Front*, 24 NY3d at 719). In *Front*, however, we "recognize[d] that extending privileged status to communications made prior to anticipated litigation has the potential to be abused" and that "applying an absolute privilege to statements made during a phase prior to litigation would be problematic and unnecessary to advance the goals of encouraging communication prior to the commencement of litigation" (*id.*). The privilege is therefore qualified, meaning that it may be "lost" only "where a defendant proves that the statements were not pertinent to a

good faith anticipated litigation" (*id.* at 720). This is the "logical basis to distinguish" (dissenting op at 18) between this qualified pre-litigation privilege and the absolute litigation privilege.[3] Here, as the courts below held, there is an issue of fact for the jury as to whether the California suit was at this stage "good faith anticipated litigation."

Sebert claims that 19 other statements fall under the protection offered by Civil Rights Law § 74, known as the fair report privilege. These statements are that same embargoed complaint as well as 18 additional statements including, among other things, statements made by Sebert and her representatives regarding the rape allegations in a "Press Plan" distributed to numerous media outlets, on a podcast, in television and magazine interviews, in a press release, and on various social media outlets.

The statutory privilege applies to "the publication of a fair and true report of any judicial proceeding" (Civil Rights Law § 74) where "the substance of the [statement is] substantially accurate" (*Holy Spirit Assn. for Unification of World Christianity v New York,* 49 NY2d 63, 67 [1979]). This Court has excluded from the privilege's coverage statements made by those who "maliciously institute a judicial proceeding alleging false and defamatory charges" (*Williams v Williams*, 23 NY2d 592, 599 [1969]).[4] We disagree with

---

[3] It is the good faith of the anticipated litigation that is determinative, not the audience (dissenting op at 17-19). Nor is it relevant that a statement was made "one day prior" to filing of the action (*id.* at 18) or that it contained the "contents" of a future complaint (*id.* at n 9): communications made in anticipation of litigation are, by definition, subject to the qualified "pre-litigation" privilege.

[4] As we noted in *Williams*, this limitation on the privilege is not "intended to restrict in any manner the reporting of news stories and other reports which are made in the public

the dissent's view that *Williams* is limited to "the filing of a false complaint by a principal of a company against a former principal who then sent a letter with a copy of the summons and complaint to 'interested parties engaged in the same trade' " (dissenting op at 21, quoting *Williams*, 23 NY2d at 606 [Fuld, C.J., dissenting in part]).   Rather, it is an admittedly narrow qualification to the statutory privilege, applicable in this case, where there is a question of fact as to whether the litigation in California and counterclaims in New York were brought by Sebert in good faith or maliciously to defame Gottwald and pressure plaintiffs to release her from her contracts.   Regarding the 19 statements purportedly covered by the statutory privilege, that is a question appropriately left for the jury.

## IV.

Finally, we address whether the 2020 amendments to the anti-SLAPP statute apply to this litigation.   As enacted in 1992, the anti-SLAPP statute was "designed to protect citizens who participate in public affairs," namely those relating to applications requiring government approval, against retaliatory lawsuits (Sponsor's Mem, Bill Jacket, L 1992, ch 767]).   As relevant here, former Civil Rights Law § 76-a (1) (a) provided:

> "An 'action involving public petition and participation' is an action, claim, cross claim or counterclaim for damages that is brought by a public applicant or permittee, and is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission."

---

interest" (21 NY2d at 599).   Rather, it applies only to those who are shown to have "maliciously institute[ed]" a proceeding (*id*.).

The statute defined "an action involving public petition and participation" narrowly to include only claims "brought by a public applicant or permittee," further defined as "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body, or any person with an interest, connection or affiliation with such person that is materially related to such application or permission" (Civil Rights Law former § 76-a [1] [a], [b] [1992]). Claims covered by the statute require proof of actual malice by clear and convincing evidence (Civil Rights Law former § 76-a [2]). Defendants in a SLAPP suit were entitled to a counterclaim and, if successful, could potentially recover costs, attorney's fees, and damages (Civil Rights Law former § 70-a [1] [a], [b], [c] [1992]).

The legislature enacted the 2020 amendments to "extend the protection" of the 1992 statute to a broader class of individuals (Senate Introducer's Mem in Support, Bill Jacket, L 2020, ch 250]). Those amendments substantially expanded the definition of "an action involving public petition and participation" to include "a claim based upon: (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition" (Civil Rights Law § 76-a [1] [a] [1], [2] [2020]). The term " '[p]ublic interest' shall be construed broadly, and shall mean any subject other than a purely private matter" (Civil Rights Law § 76-a [1] [d]).

The amendments altered the remedy offered by Section 70-a for defendants falling within the purview of the amended Section 76-a. That section empowers defendants to "maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action" (Civil Rights Law § 70-a [1]). The award of costs and attorney's fees to defendants was made mandatory rather than a matter of discretion (Civil Rights Law § 70-a [1] [a]). Sections providing for the discretionary award of compensatory and punitive damages were not amended but have far broader application given the expanded scope of the relevant definitions (Civil Rights Law § 70-a [1] [b] and [c] [emphasis added]).

Sebert asserts that the broadened definition of public petition and participation in Section 76-a applies to this action and establishes the governing standard for liability. However, because we now hold that Gottwald is a limited public figure who must prove by clear and convincing evidence that the allegedly defamatory statements were made with actual malice, we do not address whether the provision of the amended statute (Civil Rights Law § 76-a [2]) imposing that standard applies to actions pending at the time of its enactment.

Sebert further contends that she may now assert a counterclaim for damages and attorney's fees under Section 70-a. After conducting a retroactivity analysis, Supreme Court agreed and granted Sebert leave to amend her answer to assert a Section 70-a counterclaim, holding that the 2020 amendments should "apply to pending cases" because

of the legislation's "important purpose" in amending the statute and that application to pending cases would not violate Gottwald's due process rights.

The Appellate Division reversed, holding that "there is insufficient evidence supporting the conclusion that the legislature intended" the amendments "to apply retroactively to pending claims" (203 AD3d at 488). The Court determined that "the presumption of prospective application" had not been overcome given that "[t]he legislature did not specify that the new legislation was to be applied retroactively" and that "[t]he legislature acted to broaden the scope of the law almost 30 years after the law was originally enacted, purportedly to advance an underlying remedial purpose that was not adequately addressed in the original legislative language" (*id.* at 489). Because the court held that the amendments did not apply to actions pending at the time the amendments were enacted, it denied Sebert's motion for leave to assert a counterclaim pursuant to Section 70-a.

"[R]etroactive operation is not favored by the courts and statutes will not be given such construction unless the language expressly or by necessary implication requires it" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 584 [1998]). This approach reflects a "deeply rooted presumption against retroactivity . . . based on elementary considerations of fairness" (*Regina Metropolitan Co., LLC v New York State*, 35 NY3d 332, 370 [2020] [internal citations, quotation marks, and alterations omitted]). But "[a] statute does not operate 'retrospectively' merely because it is applied in a case

arising from conduct antedating the statute's enactment" (*Landgraf v USI Film Products*, 511 US 244, 269 [1994]).

Here, the legislature did not "expressly prescribe[] the statute's proper reach" and therefore we must apply the "judicial default rules" in assessing retroactivity (*id.* at 280). Pursuant to these rules, we look to the text of the statute to determine whether it was intended to have retroactive effect (*id.*). The language chosen here makes clear that the intended application is prospective. A counterclaim may be maintained against any person who "commenced or continued" an action involving public participation (Civil Rights Law § 70-a [1]; *see* Civil Rights Law § 76-a). Similar language is found in the provision providing for costs and attorney's fees, where the action was "commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law" (Civil Rights Law § 70-a [1] [a]). "[O]ther compensatory damages" and punitive damages are recoverable "upon an additional demonstration" that the action was "commenced or continued for the purpose [or, with respect to punitive damages, for the "sole purpose"] of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights" (Civil Rights Law § 70-a [1] [b], [c]). There is no retroactive effect when these provisions are applied, according to their terms, to the continuation of the action beyond the effective date of the amendments. To the extent that Sebert's statements constitute public petition and participation, and should a factfinder determine that she meets the other relevant statutory conditions, Gottwald's continuation of his suit

beyond the effective date of the amendments entitles Sebert to recover damages. Because Gottwald's liability attached, if at all, when he chose to continue the defamation suit after the effective date of the statute, any potential calculation of attorney's fees or other damages begins at the statute's effective date (*see Landgraf*, 511 US at 281-283; *see also id*. at 275 n 29).

Sebert, and our dissenting colleague (*see* dissenting op at 5-13), would find legislative intent to calculate fees and damages from the commencement, rather than the continuation, of the suit. But "it takes a clear expression of the legislative purpose . . . to justify retroactive application of a statute" (*Regina,* 35 NY3d at 370 [internal citations, quotation marks, and alterations omitted]). Here, we do not find anything approaching the required expression of clear legislative intent. While the statute directs that it "shall take effect immediately," we have previously held that, for purposes of determining retroactive application, "the meaning of [that] phrase is equivocal" and is not "enough to require application to pending litigation" (*Becker v Huss Co.*, 43 NY2d 527, 541 [1978]; *see also Majewski*, 91 NY2d at 583; *Landgraf,* 511 US at 257). Nor is there anything in the amended statute requiring retroactive application "by necessary implication." As to the dissent's suggestion that the statute is "remedial," a statute imposing damages is not "the sort of 'remedial' change that should presumptively apply in pending cases" (*Landgraf*, 511 US at 285 n 37; *see Regina*, 35 NY2d at 365).

Sebert argues that the fact that express language providing that the statute "shall apply to actions *commenced* on or after" the statute's effective date was removed during

the drafting process clearly indicates the legislature's intent that the amendments apply retroactively.  This is not the effect of that change.  Had that language been included, application to pending litigation—whether retroactive or not—would have been barred by the express terms of the statute.  Instead, as enacted, the amendments apply to pending cases insofar as they have been continued after the effective date.  The dissent's reliance on this history to support a finding of retroactive intent is misplaced (dissenting op at 9).  In *Majewski*, evidence that removal in the drafting process of a provision that the statute would apply to "lawsuits that have neither been settled nor reduced to judgment" could, we noted, be considered "evidence consistent with the strong presumption of prospective application" (91 NY2d at 587).  It is not evidence sufficient to overcome that strong presumption.

Moreover, this is not a case where the legislative history indicates that "the purpose of the new legislation is to clarify what the law was always meant to say and do" (*id.* at 585) or to "correct" an overly "narrow" interpretation by the courts (dissenting op at 7).  Rather, the legislature intended the amendments to greatly expand the limited coverage offered by the original anti-SLAPP statute (*see Landgraf*, 511 US at 252-253 [amendment "significantly expand[ed] the monetary relief potentially available" under prior law]).  Accordingly, the strong presumption against retroactive legislation has not been overcome with respect to the amendments to the anti-SLAPP statute.

Application of the amendments to Gottwald's post-effective date continuation of the action does not "upset[] reliance interests" or "trigger[] fundamental concerns about

fairness" (*Regina*, 35 NY3d at 365). Although the "[r]etroactive imposition of punitive damages" raises constitutional concerns, those concerns become relevant only if the statute "explicitly authorized damages for preenactment conduct" (*Landgraf*, 511 US at 281). Similarly, the imposition of compensatory damages is problematic only if it penalizes conduct predating the statute (*id.* at 281-282). Our interpretation of the application of the fees and damages provisions does not implicate these concerns (*see id*. at 267 n 21 ["In some cases . . . the interest in avoiding the adjudication of constitutional questions will counsel against a retroactive application"]).[5] As applied here, Sebert may assert a counterclaim under Civil Rights Law § 70-a and, if successful, recover costs, attorney's fees, and damages based on Gottwald's continuation of this action following the amendment's effective date.

*          *          *

Accordingly, in *Gottwald v Sebert I*, the order of the Appellate Division should be reversed, with costs, Sebert's motion to amend her answer to assert a counterclaim pursuant to Civil Rights Law § 70-a granted, and the certified question answered in the negative. In *Gottwald v Sebert II*, the order of the Appellate Division should be modified, without costs, in accordance with this opinion, as so modified affirmed, and the certified question answered in the negative.

---

[5] It is unclear whether the dissent would authorize such constitutionally suspect punitive damages for pre-enactment conduct (*see* dissenting op at 12-13 and n 6).

RIVERA, J. (dissenting in part):

The underlying litigation presents two counter-narratives. In one, a popular singer alleges she was raped and then exploited for years by a successful music producer who refused to free her from her lucrative recording and publication contracts. In the other, the music producer claims the singer defamed him and his companies with false claims of

sexual abuse and harassment when he did not agree to more favorable business terms. These are familiar counter-narratives reflecting the power dynamic between a powerful mentor and an up-and-coming mentee, but they have taken on a new resonance in an era of increased public awareness of sexual abuse at the workplace. Assuming the parties do not settle, a jury eventually must decide which version to believe and to what extent. Our task here is to decide what legal standards govern the parties' respective claims.

I agree with several of the majority's conclusions but my analysis differs in certain important respects. First, I agree that respondents must establish malice to succeed on their defamation claims. For all but one claim, this is their statutory burden of proof under New York's Civil Rights Law—specifically the amended anti-SLAPP law—and, as the majority correctly holds, malice is also the standard applied to all the claims under established principles of defamation law. I also agree that the anti-SLAPP law's remedies apply to this pending action, but not as temporally limited by the majority. Lastly, I agree the alleged defamatory statements in a previously-filed complaint are privileged, but I cannot agree that there are outstanding factual issues regarding the remaining challenged statements. Based on our precedent and the intended purpose of the privileges asserted, I would hold that the pre-litigation privilege applies to an embargoed draft of the complaint sent to counsel for settlement purposes and to a tabloid the day before filing. Further, the statutory fair report privilege applies to all but two of the allegedly defamatory statements to the media.

I.

Respondents are Lukasz Gottwald, known professionally as "Dr. Luke," and his two affiliated companies. The moniker identifies him as the music producer of several pop hits which have made him both a well-known and well-fixed personality—and not just within the music industry. For years he has actively promoted his success in the media, having appeared on a major television network and having been the subject of major stories in print and digital publications with extensive readership.[1] By any account, his public relations agents have done a masterful job.

Appellant Kesha Rose Sebert is the singer "Kesha," who has several number one hits to her credit. Dr. Luke was instrumental to Kesha's career,[2] developing an interest in her when she was 18 years old after a colleague gave him a CD recording of Kesha singing. Shortly thereafter, Dr. Luke and Kesha signed a six-album record deal and Kesha relocated to Los Angeles. The two collaborated on Kesha's first album, which sold over two million copies and catapulted her to worldwide fame. Her follow-up extended play (EP) and second album enjoyed similar commercial success.

Respondents filed a defamation action against Kesha in New York state court based on claims associated with a California lawsuit she filed earlier that day against Dr. Luke, wherein she alleged that he drugged and raped her after a 2005 Hollywood party and verbally and emotionally abused her throughout their working relationship. Kesha sought

---

[1] Dr. Luke was profiled in The New Yorker, which boasts a paid circulation of over 1.2 million, and New York Magazine, which has a readership of over 150,000 (Alliance for Audited Media, Magazine Media – Snapshot Report [Dec. 31, 2022], available at https://abcas3.auditedmedia.com/ecirc/magtitlesearch.asp [accessed May 8, 2023]).

[2] I refer to both parties by the professional names for which they are famously known.

rescission of her contracts and various damages. In respondents' defamation action, Kesha asserted counterclaims of sexual assault and battery, sexual harassment, bias-related violence under New York Civil Rights Law § 79-n, gender-motivated violence under New York City Administrative Code § 8-904, and intentional infliction of emotional distress. In support, Kesha contends that respondents' defamation suit is subject to New York's current anti-SLAPP law and thus requires that they show her statements were made with malicious intent, and that regardless, the same malice standard applies because Dr. Luke is a public figure. She further claims she may seek compensatory and punitive damages, attorney's fees and costs as provided under the law should she succeed on her counterclaims. Respondents counter that the law was amended in 2020 during the pendency of this defamation action and may not be applied retroactively to their claims, meaning that they need only show negligence and Kesha's statutory counterclaims may not proceed.

For the reasons I discuss, the amended anti-SLAPP law applies to this pending action, and for the one claim outside the statute, respondents must establish malice because as a matter of common law Dr. Luke is a public figure for the limited purpose of this litigation.

## II.

Generally, a court must apply "the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary" (*Bradley v School Bd. of City of Richmond*, 416 US 696, 711 [1974]; *see also Thorpe v Hous. Auth. of City of Durham*, 393 US 268 [1969]). Express

language as to the operative effect of a statute is unnecessary absent these identified limiting grounds. Indeed, "[e]ven absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations" (*Landgraf v USI Film Products*, 511 US 244, 273 [1994]). Prospective application is only mandated where newly enacted statutory language would have the retroactive effect of impairing substantive rights and due process guarantees (*see id*. at 278-280). Here, the Legislature intended the amended anti-SLAPP law to apply to this pending litigation and doing so would not impair respondents' substantive rights or otherwise be unfair.

## A.

New York, like most states, has enacted an anti-SLAPP law—short for anti-Strategic Lawsuits Against Public Participation—to protect defendants against lawsuits based on protected speech.[3] New York first enacted its version in 1992 and amended it in 2020. The relevant amendments clarified that the statute covered speech in connection "with an issue of public interest" and required that plaintiffs establish a defendant's malice in actions involving such speech (Civil Rights Law § 76-a), and recognized a defendant's claim for damages, attorney's fees and costs against a person instituting such action (*id*. § 70-a).

---

[3] 32 other states have an anti-SLAPP law, approximately 20 of which are comparably broad to New York's version (*see Updates to the Anti-SLAPP Report Card*, Institute for Free Speech [May 18, 2022], available at https://www.ifs.org/blog/updates-to-the-anti-slapp-report-card/ [accessed June 5, 2023]).

The amendments are remedial, and the Legislature specifically intended them to enhance protections for defendants and thereby minimize litigation that chills free speech (*see Asman v Ambach*, 64 NY2d 989, 991 [1985] ["amendments are to be viewed as remedial" where they are "designed to correct imperfections in the prior law, by giving relief to an aggrieved party"] [cleaned up]; *see also* Assembly Sponsor's Mem, Bill Jacket, L 2020, ch 250 [explaining that the amendments will better protect SLAPP-suit defendants from the "threat of personal damages and litigation costs" associated with abusive litigation]). We must assume that the Legislature was aware of the well-established rule that remedial legislation applies to pending litigation "to effectuate its beneficial purpose" (*Matter of Gleason [Michael Vee, Ltd.]*, 96 NY2d 117, 122 [2001]).[4]

---

[4] The majority is correct that a footnote in *Landgraf* acknowledged that the general presumption that remedial statutes should apply to pending cases might not apply to statutes "introducing damages liability" (511 US at 285 n 37; *see* majority op at 16). However, the footnote did not foreclose the application of newly modified remedies to pending cases. The Court quoted *Hastings v Earth Satellite Corp.* (628 F2d 85, 93 [DC Cir 1980]) for the proposition that " '[r]etroactive modification' of damages remedies may 'normally harbo[r] much less potential for mischief than retroactive changes in the principles of liability . . . but that potential is nevertheless still significant" (*id*.). Here, the amendments do not introduce a new remedy for past conduct, but simply modify an existing remedy, and the only question is whether that modification as applied to respondents' pending action works an unfairness and upsets prior expectations. In that vein, the Supreme Court's reference to *Hastings* is particularly apt. *Hastings* recognized the distinction between remedies and principles of liability with respect to the retroactive application of both, noting that, unlike "retroactive creation of legal responsibilities or abolition of legal rights [which] risks unfairness because the retroactive change confounds the expectations upon which persons acted," "[r]etroactive modifications in remedy [] do not involve the same degree of unfairness. Such modifications do not transform a legal act into an illegal act[]. Modification of remedy merely adjusts the extent, or method of enforcement, of liability in instances in which the possibility of liability previously was known" (628 F2d at 93). That is precisely the effect of section 70-a, which adjusts the extent of liability already known to any plaintiff who files a frivolous lawsuit. Accordingly, the "mischief" referenced in the *Landgraf* footnote is not present here. Inasmuch as the

As the legislative history establishes, and contrary to the majority's assertion (*see* majority op at 17), the amendments were intended to correct the prior anti-SLAPP regime which courts had interpreted too narrowly to adequately protect defendants and our state's interest in free public discourse on issues of public concern.

The Senate Sponsor's Memorandum states:

> "Section 76-a of the Civil Rights Law was originally enacted by the Legislature to provide 'the utmost protection for the free exercise[,] speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern.' L. 1992 Ch. 767. However, as drafted, and as narrowly interpreted by the courts, the application of Section 76-a has failed to accomplish that objective. In practice, the current statute has been strictly limited to cases initiated by persons or business entities that are embroiled in controversies over a public application or permit, usually in a real estate development situation. Meanwhile, many frivolous lawsuits are filed each year that are calculated solely to silence free speech and public participation, which do not specifically arise in the context of the public 'permit' process. By revising the definition of an 'action involving public petition and participation,' this amendment to Section 76-a will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law. This is done by broadly widening the ambit of the law to include matters of 'public interest', which is to be broadly construed, e.g. anything other than a 'purely private matter'.
>
> Additionally, the principal remedy currently provided to victims of SLAPP suits in New York is almost never actually imposed. The courts have failed to use their discretionary power to award costs and attorney's fees to a defendant found

---

majority suggests that *Regina*'s parenthetical citation to that footnote is relevant to this analysis (35 NY2d at 365), *Regina* should not be understood to overrule our longstanding presumption applying remedial statutes to pending cases (*see Palin v New York Times Co.*, 510 F Supp 3d 21, 28 [SD NY 2020] ["Nothing in *Regina* suggests that it is overturning the general rule that remedial legislation . . . is presumed to have retroactive effect"]).

to have been victimized by a frivolous lawsuit intended only to chill free speech. By an award of costs and fees, the Legislature had originally intended to address 'threat of personal damages and litigation costs . . . as a means of harassing, intimidating, or punishing individuals, unincorporated associations, not-for-profit corporations and others who have involved themselves in public affairs.' L. 1992 Ch. 767. This amendment to Section 70-A of the Civil Rights Law makes clear that a court 'shall' impose an award of costs and fees, but only if the court [finds] [sic] that the case has been initiated or pursued in bad faith. Together, the two amendments will protect citizens against the threat – and financial reality – of abusive litigation, but will not discourage meritorious litigation.

Further, a mandatory award of attorney's fees is necessary to discourage SLAPP lawsuits – which attempt to chill free speech by definition – from being instituted" (Senate Sponsor's Mem, Bill Jacket, L 2020, ch 250).

Likewise, the Assembly Sponsor explained to the Governor that "[i]n recent years, we have seen a growth—in New York and nationwide—in these types of [SLAPP] suits, which are brought with one goal in mind: to stifle the free expression of ideas and/or criticism" (Assembly Sponsor's Letter to the Governor, L 2020, ch 250). She explained that because the prior version of the law "has proven inadequate to stem the rising tide [of such suits]," the new bill "updates and modernizes [the statute] by expanding the breadth of the law and also putting teeth into it" (*id.*). Clearly, the drafters of the amendments recognized that the 1992 statute left individuals exposed to abusive litigation and deprived of financial recourse, and thus considered it important to ensure robust remedies. It would be nonsensical to assert that the Legislature intended to deny current SLAPP-suit victims the benefit of the amended statute simply because they began defending a defamation

action before the amendments were enacted. To the contrary, the legislative history reveals the very fact of those existing lawsuits was the impetus for the amendments.

Moreover, the Legislature instructed that the amendments "shall take effect immediately" (L 2020, ch 250 § 4). Although the majority is correct that such language alone does not require application to pending cases (majority op at 16), there is more. Given the legislative history, and the sense of urgency that animated legislative action against increased SLAPP litigation, the choice not to delay the amendments' effective date further supports the legislative desire that the law apply to all pending matters.

The drafting history confirms this intent. An earlier draft of the amendments included express language stating that the statute "shall apply to actions commenced on or after" the statute's effective date. The Rent Stabilization Association, a trade organization with an interest in the anti-SLAPP law, took note of the removal of the language and wrote to the Governor, requesting that the original prospectivity language be restored. The phrase was not reinserted in the final version of the bill the Governor signed into law, making it apparent that the Legislature and the Executive made a concerted decision—over objections of an interested party—to excise any language limiting the law's application to future cases.

The Court has previously found such action indicative of legislative intent. In *Majewski v Broadalbin-Perth Cent. School Dist.*, the Court examined certain amendments to the Workers' Compensation Law which, in an earlier draft, "expressly provided that it would apply to lawsuits that have neither been settled nor reduced to judgment by the date of its enactment" (91 NY2d 577, 587 [1998] [internal quotation marks omitted]). Like here,

that proposed language "d[id] not appear in the enacted version" (*id.*). Reciting the principle that a "court may examine changes made in proposed legislation to determine intent," the Court held that the deletion of the language in *Majewski* was consistent with the intent that the statute apply only prospectively (*id.*). Applying that same principle here, the Legislature's consideration and rejection of the prospective-only language shows that it intended the amended statute to apply to pending claims. Indeed, contrary to the majority's misguided view, removal of prospective-only language that was criticized because it would prohibit the application of the statute to pending litigation is as close to express intent as it gets without the actual words.

## B.

Respondents' contention that application of the amendments to this litigation will have a constitutionally impermissible retroactive effect is mistaken. Applying the amended anti-SLAPP statute to this litigation as of the day of its commencement does not impact respondents' substantive rights and therefore presents no unfairness.[5] First, the

---

[5] Other New York courts—state and federal—have likewise applied the amendments to lawsuits pending at the time of enactment (*see e.g. Palin*, 510 F Supp 3d at 28 [holding that the amendments are remedial and that defamation plaintiff "was never entitled to recover monetary damages absent a showing of malice"]; *Reus v ETC Hous. Corp.*, 72 Misc 3d 479 [Sup Ct, Clinton County 2021], *affd* 203 AD3d 1281 [3d Dept 2022]; *Coleman v Grand*, 523 F Supp 3d 244 [ED NY 2021]; *Sackler v Am. Broadcasting Cos.*, 71 Misc 3d 693 [Sup Ct, New York County 2021]; *Veritas v New York Times Co.*, 2021 WL 2395290 [Sup Ct, Westchester County 2021]; *Kurland & Assocs., P.C. v Glassdoor, Inc.*, 2021 WL 1135187 [Sup Ct, New York County 2021]; *Sweigert v Goodman*, 2021 WL 1578097 [SD NY 2021]; *Reilly v Crane Tech Solutions, LLC*, 2021 WL 2580281 [Sup Ct, New York County 2021]; *Cisneros v Cook*, 2021 WL 2889924 [Sup Ct, New York County 2021]; *Griffith v Daily Beast*, 2021 WL 2940950 [Sup Ct, New York County 2021]; *Goldman v.*

amendments do not foreclose respondents' defamation claims. For example, the amendments did not abolish a pre-existing cause of action for defamation or otherwise eliminate a basis for respondents' recovery against Kesha, but simply modified respondents' burden of proof. Litigants have no "vested interest in any rule of law entitling [them] to have the rule remain unaltered" (*Preston Co. v Funkhouser*, 261 NY 140, 144 [1933]), and certainly there is no constitutionally protected interest in the application of a common evidentiary standard of fault that governs certain defamation actions to respondents' claims. Second, even if the statutory burden of proof did not apply, as the majority holds, respondents' claims are nevertheless subject to the same requirement that they establish malice under general defamation law principles. Respondents have understood all along that they might be subject to that standard. Indeed, they alleged in the initial complaint and in each of the three amended complaints that Kesha acted with malice. Respondents also were well aware when they commenced this litigation that in order to avoid application of the malice standard they would have to argue that despite Dr. Luke's notoriety, he is not a public figure, even for limited purposes. And they did so argue, repeatedly, advocating that point in the Appellate Division and before us. Respondents cannot belatedly claim that it would be unfair to apply a standard which they have argued in the alternative is both satisfied here and does not apply to them under existing case law. Third, respondents cannot point to any conduct Dr. Luke would have changed based on the

---

*Reddington*, 2021 WL 4099462 [ED NY 2021]; *Great Wall Medical P.C. v Levine*, 2022 WL 869725 [Sup Ct, New York County 2022]; *Kesner v Buhl*, 590 F Supp 3d 680 [SD NY 2022]).

amendments if they had been in effect at the time of the alleged abuse. Retroactive effect impacts actions that underlie litigation, not litigation conduct itself.

In the same vein, the financial relief available under section 70-a applies here and should be measured from the moment respondents filed their complaint. As the majority notes, this section applies to actions continued after the effective date of the amended language (majority op at 15).[6] When respondents chose to continue the litigation, they could not reasonably expect that the amended provision would not apply. As to any additional relief measured from the date of commencement, any party who files a completely baseless action or who files an action solely to harass risks financial penalties. For example, a court may, in its discretion, award any party or attorney the costs and attorney's fees resulting from frivolous litigation, and a court may also impose financial sanctions upon a party engaging in frivolous conduct, including conduct meant to harass (22 NYCRR 130-1.1; *see e.g. Maroulis v 64th Street Third Ave. Assoc.*, 77 NY2d 831, 833 [1991] ["frivolous and meritless motion practice" amounted to "abuse of the judicial process (which) supports the imposition of (monetary) sanctions"]; *see also* CPLR 3126

---

[6] The majority's prospective-only construction of the "commenced or continued" language in section 70-a (1) of the amended statute is an overly narrow construction of that phrase. The fact that any action continued at the time of the effective date of the amendments falls within the scope of the statute means just that; it does not necessarily or by implication mean that monetary relief is measured from the effective date. Despite the majority's effort to complicate straightforward language, the meaning and effect of the word "commenced" in the phrase "commenced or continued" tracks to the person who commenced the prohibited legal action. Additionally, the majority's interpretation is "at odds with the remedial nature" of the amendments (*Matter of Marino S.*, 100 NY2d 361, 373 [2003]), which were intended to correct the former statute's overly narrow definition of "public petition" and to better protect victims of SLAPP lawsuits (*see* discussion of legislative history, *supra* at 6-8).

[authorizing a court to impose monetary sanctions for a party's refusal to obey an order for disclosure]). Sanctions are a common and expected consequence for misuses of judicial process which financially injure the opposing party and "divert[] unnecessarily" "the time and attention of [the] Judges of this State" (*Minister, Elder & Deacons of Refm. Prot. Dutch Church of NY v 198 Broadway*, 76 NY2d 411, 415 [1990]; *cf. Engel v CBS, Inc.*, 93 NY2d 195, 207 [1999] [lawsuits brought for an improper purpose "not only waste precious judicial resources, but are also anathema to the justice system itself"]).

Respondents' reliance on *Regina Metro. Co., LLC v New York State Div. of Hous. and Community Renewal* (35 NY3d 332 [2020]) is misplaced. There, the Court restated the rule that "[a] statute has retroactive effect if 'it would impair rights a party possessed when [they] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed,' thus impacting 'substantive' rights (*id*. at 365, citing *Landgraf*, 511 US at 278-280). But, as I discuss, no such rights are impacted here and respondents have no identifiable reliance interests in the pre-amendment law. Thus, application of the amendments to the pending litigation does not produce a retroactive effect.

III.

There is one claim not within the scope of the anti-SLAPP law and therefore respondents' burden of proof is assessed under established defamation law principles. A plaintiff in a defamation action typically "must show: (1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm,

unless the statement is one of the types of publications actionable regardless of harm" (*Stepanov v Dow Jones & Co., Inc.*, 120 AD3d 28, 34 [1st Dept 2014]). However, a plaintiff who is a public official or public figure "must prove the statement was made with actual malice, i.e., with either knowledge that it was false or reckless disregard for the truth" (*Huggins v Moore*, 94 NY2d 296, 301 [1999] [internal quotation marks omitted]). "In some instances an individual may achieve such pervasive fame or notoriety that [they] become[ ] a public figure for all purposes and in all contexts" (*Gertz v Robert Welch, Inc.,* 418 US 323, 351 [1974]). By contrast, a "limited purpose" public figure is "an individual [who] voluntarily injects [themselves] or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues" (*id.*).

Respondents unpersuasively assert that Dr. Luke is not a public figure. Dr. Luke is at the top of his profession and has cultivated a notorious public persona. He has actively sought and gained media attention, rising above lesser-known figures in the music industry. His bankable success is based primarily on producing pop hits with young female artists like Kesha. Therefore, I agree with the majority that he is a limited public figure, as we have defined that term (majority op at 5-6).[7]

Although the court unanimously rejects respondents' contentions, it is important to clarify that respondents' proposed definition for a limited purpose public figure has no place in our law. They assert that if an individual lacks the pervasive fame required to establish that they are a public figure for *all* purposes, then any lesser level of fame is

---

[7] As a consequence, we need not consider whether Dr. Luke is a general public figure for all purposes.

irrelevant. Under that proposed standard, a public figure for limited purposes must comment on the specific topic that is the basis for the alleged defamatory statement—here, the sexual assault of young female artists in the pop industry by those with power to affect their careers. That is too narrow a view of limited-purpose public figures, and it is contrary to our precedent. It also conveniently ignores the nature of Kesha's claims that she was the target of sexual abuse made possible by a power structure wherein artists—particularly women and other marginalized individuals—are treated as prey by those with power to make or break their careers. What person alleged to have sexually assaulted an artist would comment publicly on the value of such conduct? What individual with the power that Kesha alleges Dr. Luke exercises over his female clients would publicly acknowledge the alleged abusive nature of the relationship?

It is only after the #MeToo movement that sexual harassment and abuse became the topic of a global public platform (*see Cole v Cole*, 35 NY3d 1012, 1015 [2020] [Rivera, J., dissenting] ["Recently, in an impressive demonstration of organizing, the Me Too Movement has effectively used social media to call for change and engage survivors of sexual violence at unprecedented levels"]). Through the public commons of social media, the movement shone a light on the prevalence of sexual abuse in society generally, but also particularly within the entertainment industry. To adopt the narrow standard advocated by respondents would be to insulate powerful individuals in any given industry who are all but guaranteed never to comment publicly on the abusive power dynamics from which they benefit.

Under our public figure doctrine as correctly applied by the majority, Dr. Luke is a public figure in his professional capacity for the limited purpose of this litigation (majority op at 6).[8] Accordingly, to succeed on their remaining defamation claim, respondents must prove that Kesha acted with actual malice.

IV.

Turning to the litigation-related privileges asserted by Kesha, I agree that there is no "sham exception" to the absolute privilege for statements made in judicial proceedings (majority op at 8-9). Therefore, as the majority concludes, the statements relating to Kesha's California complaint, along with her counterclaims and assertions in the instant action, are absolutely privileged (*id*. at 9). However, I disagree with the majority that all of the statements for which Kesha asserted the pre-litigation and fair report privileges must

---

[8] The majority below determined that Dr. Luke was not a public figure based on the conclusion that he had not achieved the status of a "household name" (*Gottwald v Sebert*, 193 AD3d 573 [1st Dept 2021]). That standard has its genesis in a line of First Department cases holding that the class of all-purpose public figures "generally consists of people who have achieved enough prominence in society that their names are tantamount to household words," as well as "political figures" (*see e.g. Farrakhan v N.Y.P. Holdings, Inc*., 168 Misc2d 536, 539 [Sup Ct, New York County 1995], *affd* 238 AD2d 197 [1st Dept 1997], *lv denied* 91 NY2d 803 [1997]; *Krauss v Globe Intl., Inc*., 1996 WL 780550, *3 [Sup Ct, New York County 1996], *affd as mod* 251 AD2d 191 [1st Dept 1998]). But the First Department has not addressed the normative basis for determining whether an individual has achieved public figure status. Which and how many households count in making that determination? Perhaps the focus is on households with consumers of pop music and those who work in this industry. That appears to be the approach of the dissent below when it concluded that Dr. Luke "is a household name to those that matter" (193 AD3d at 584). Notwithstanding the divided Appellate Division, we have no occasion here to consider the propriety of that standard as Dr. Luke is a public figure under our established case law.

go to a jury to determine whether she brought the underlying claims in good faith. With two exceptions, those statements are privileged as a matter of law.

First, the draft complaint in the California litigation was sent to Sony's general counsel—at her request—in order to facilitate a settlement. This is common practice and furthers the goal of avoiding litigation by fostering resolution without judicial intervention, which is precisely the purpose we identified in support of the privilege in *Front, Inc. v Khalil Enterprises* (24 NY3d 713 [2015]). *Front* held that pre-litigation communication "should be encouraged and not chilled by the possibility of being the basis for a defamation suit" because parties must be able to speak freely during settlement negotiations in order "to reduce or avoid the need to actually commence litigation" (*id*. at 719). Only where attorneys "are seeking to bully, harass, or intimidate their client's adversaries by threatening baseless litigation or by asserting wholly unmeritorious claims" is the privilege destroyed (*id*. at 720). In this case, the parties had been engaged in settlement negotiations for several months. Both parties clearly anticipated litigation, as evidenced by their separate filings on the same day. Kesha's attorney averred that he shared the draft California complaint at opposing counsel's behest, and that when the attorneys met to review the complaint, Kesha's lawyer stated that filing was imminent but that they were eager to resolve it and willing to give it another try. Hence, the parties were engaged in routine, good faith efforts to resolve the case—exactly what the pre-litigation privilege was intended to cover. There is simply no record evidence that either attorney sought to "bully, harass, or intimidate" the other by the mere fact of sharing the draft complaint before filing. The fact that they were ultimately unable to reach an agreement does not make the

statements asserted therein any less privileged. Otherwise, there would be nothing left to the privilege as negotiating parties would rightly be unwilling to share drafts of litigation documents. The majority's interpretation severely limits settlement efforts, in contravention of *Front*.

Moreover, since the majority agrees that the contents of the filed California complaint are absolutely privileged as statements made during the course of a judicial proceeding (majority op at 8-9), it is odd to conclude that Kesha's allegations as they appeared in the filed complaint are privileged, while her identical allegations as they appeared in the draft complaint are not similarly protected simply because the former was served on counsel and the latter was provided to counsel as a courtesy in anticipation of litigation.

For the same reason, the sending of an embargoed copy of the California complaint to TMZ the day before it was filed is likewise privileged as a matter of law. Again, there is no logical basis to distinguish between the complaint as it was filed and the complaint as it was shared with a media outlet one day prior with the understanding that it could not be made public until after the actual filing.[9]

---

[9] Contrary to the majority's suggestion, I do not maintain that it is the intended audience of the statement that determines whether the privilege applies (majority op at 10 n 3). Neither do I mean to conflate the pre-litigation and absolute litigation privileges (*id*. at 10). The point is that the contents of the complaint as-filed and as-shared were identical, and the majority offers no sound reason to privilege the allegations as they appeared in one but not the other. In any case, the embargoed complaint sent to a media outlet that could not be made public until after filing falls within the fair report privilege.

As to the remaining 19 allegedly defamatory statements, all but two are covered by the statutory fair report privilege as Kesha alleged. An "action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published" (Civil Rights Law § 74). "For a report to be characterized as fair and true within the meaning of the statute . . . it is enough that the substance of the article be substantially accurate" (*Holy Spirit Ass'n for Unification of World Christianity v New York,* 49 NY2d 63, 67 [1979] [internal quotation marks omitted])

In a 2014 cable news interview and during an episode of a legal issues podcast, Kesha's attorney suggested that Dr. Luke's conduct was not limited to Kesha. However, Kesha's complaint did not allege that Dr. Luke sexually assaulted or otherwise abused multiple women. Therefore, a jury could determine that those statements are not "substantially accurate" reports of the litigation and are therefore not statutorily privileged (*Holy Spirit Ass'n,* 49 NY2d at 67). On several other occasions, the attorney compared Dr. Luke to Bill Cosby, who at the time was a prominent figure in the news for alleged sexual abuse (*see* Charlotte Alter, *Everything You Need to Know About the Bill Cosby Scandal*, TIME Magazine [Nov. 24, 2014], available at https://time.com/3602131/bill-cosby-sexual-assault-allegations-guide/ [accessed May 9, 2023]). To the extent that those statements were intended to compare Cosby's *modus operandi*—the use of the date rape drug GHB—to the method in which Dr. Luke allegedly drugged Kesha, those statements are privileged because they reflect specific allegations she has made in the course of the litigation. Each

of the other statements for which Kesha asserted the statutory fair report privilege should be protected, as they pertain to the allegations made in the litigation and are substantially accurate reports of the proceedings.

The narrow exception to the fair report privilege set out in *Williams v Williams* (23 NY2d 592 [1969]) has no application here. In that case, the defamation defendant had instituted an action against his brother and former business partner alleging that the brother "conspired with others to misappropriate and misuse the company's trade secrets and assets" (*id*. at 595). He then had copies of the complaint "printed and circulated to members of the trade" (*id*.). Noting the "unusual factual pattern" of the case (*id*. at 596), the majority determined that Civil Rights Law § 74 did not apply because the defendant had maliciously instituted the underlying action solely so that he could "circulate a press release or other communication based thereon and escape liability by invoking the statute" (*id*. at 599).[10]

As the Court declared, *Williams* is limited to its unique facts—the filing of a false complaint by a principal of a company against a former principal who then sent a letter with a copy of the summons and complaint to "interested parties[] engaged in the same trade" (*id*. at 606 [Fuld, C.J., dissenting in part]).[11] We should not extend it lest we risk eroding the privilege altogether. Chief Judge Fuld (joined by Judge Bergan) argued in dissent that the majority, driven by "an unreasoned and unreasonable fear of abuse," had

---

[10] On appeal from the denial of the defendant's motion to dismiss, the Court presumed that the plaintiff's factual allegations were true (23 NY2d at 595-596, citing CPLR 3211).

[11] The majority's attempt to marginalize this interpretation of *Williams* is belied by the Court's clear exhortation that the exception is limited to "the unusual factual pattern of [that] case" (23 NY2d at 596).

reached a "strained and incongruous result" that was "not only [ ] at odds with the language and with the legislative history of section 74" but one that was "completely unnecessary to protect against the sort of abuse envisioned by the court" (*id*. at 605). In response, the majority argued that the decision would not limit free access to the courts and expressly cautioned that the holding "in no way infringes upon the right of a person to bring an action or to say or write material pertinent to a suit within the confines of that action" (*id*. at 599).

Apart from the unsound extension of *Williams* here, it is also unnecessary because the concerns that animated the Court's decision there are not implicated by Kesha's filings in California or New York. In *Williams*, the plaintiff fabricated legal claims as a vehicle to disseminate lies to fellow tradespersons for the sole purpose of maligning the defendant. The plaintiff then deployed the privilege to avoid liability for that malicious conduct. By contrast, Kesha filed her California complaint and disseminated it to the media and pressed her counterclaims in the New York litigation *in response* to respondents' lawsuit. The California filing is the exact conduct the *Williams* majority acknowledged was protected, and the responsive filing in the New York action was defensive, not initiated as affirmative abuse of the judicial process of the like presented in *Williams*. Thus, the statutory privilege applies.

V.

I agree that the certified questions in these respective appeals should be answered in the negative, but I disagree that potential relief on Kesha's counterclaims is temporally limited in the manner so held by the majority and that the privilege alleged for all but two

of her statements must be presented to a jury. Our precedents do not support the majority's

construction of the Civil Rights Law, and its treatment of the relevant privileges as factual

questions contravenes *Front* and eviscerates their intended purposes. Lawyers beware!


For No. 32:

Order reversed, with costs, defendant Kesha Rose Sebert's motion to amend her answer to assert a counterclaim pursuant to Civil Rights Law § 70-a granted, and certified question answered in the negative. Opinion by Judge Garcia. Judges Singas, Cannataro and Troutman concur and Chief Judge Wilson concurs, for the reasons stated in section IV. Judge Rivera dissents in part in an opinion. Judge Halligan took no part.

For No. 33:

Order modified, without costs, in accordance with the opinion herein, as so modified, affirmed, and certified question answered in the negative. Opinion by Judge Garcia. Judges Singas, Cannataro and Troutman concur. Chief Judge Wilson joins section II of the majority opinion herein by Judge Garcia and dissents in part for the reasons stated in section IV of the dissenting opinion herein by Judge Rivera. Judge Rivera dissents in part in an opinion. Judge Halligan took no part.

Decided June 13, 2023